Richard L. MURPHY Plaintiff,

v.

FACET 58, INC. d/b/a Masseys Jewelers Defendant.

Ronald L. Matthews Plaintiff,

v.

Facet 58, Inc. d/b/a Masseys Jewelers Defendant.

No. 2:02–CV–01396PGC, 2:02–CV–01392PGC.

United States District Court, D. Utah, Central Division.

Aug. 9, 2004.

Lauren R. Barros, Salt Lake City, UT, Jeffrey L. Silvestrini, Cohne Rappaport & Segal, Salt Lake City, UT, for defendant.

Russell T. Monahan, Stephen W Cook PC, Salt Lake City, UT, for Richard Murphy.

## ORDER AND MEMORANDUM OPINION GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

CASSELL, District Judge.

The above-captioned cases are before the court on defendant's motions for summary judgment. Oral arguments were heard in both matters on July 9, 2004. The cases were separately filed and the court has treated them separately in all respects. However, disposition in a single Order and Memorandum Opinion is appropriate because of the somewhat overlapping facts, circumstances, and applicable law. The court concludes that there is no genuine issue as to any material fact and that defendant is entitled to summary judgment in both matters. The motions are therefore GRANTED.

### BACKGROUND

Plaintiff Richard Murphy was hired by the defendant, Masseys Jewelers, on July 27, 1992. Plaintiff Ronald L. Matthews was hired by Masseys on July 19, 1990. Both worked as salespersons for Masseys at different locations along the Wasatch Front. While working for Masseys, they were paid both an hourly wage and a commission based on the sale of jewelry. Murphy was fired by Masseys on May 17, 2002. Murphy was sixty-four years old at the date of his firing. Matthews was fired by Masseys on June 15, 2002. Matthews was sixty-two years old at the date of his firing. Both filed suit against Masseys in

December of 2003. A third employee who filed suit for age discrimination, Garth Samuels, was fired by Masseys on August 29, 2001. His suit was dismissed based on the statute of limitations.[1] After they were fired, the three employees discussed the matter amongst themselves and concluded that their terminations were because of their ages.

### Murphy's Employment Record

During his tenure with Masseys, Murphy consistently ranked near the bottom in sales among Masseys' salespersons. In 1998, Murphy's annual ranking was twenty-first out of twenty-three salespersons. In 1999, Murphy ranked sixteenth out of seventeen salespersons who had been employed the entire year. In 2000, Murphy's sales ranked him seventeenth out of seventeen salespersons who worked the full year. Murphy was outsold in 2000 by a salesperson who was with Masseys for only five months of the year and who worked part-time. In 2001, Murphy again ranked last among salespersons who worked the entire year and was again outsold by a part-time salesperson. In January and February of 2002, Murphy was again at or near the bottom among Masseys' salespersons. One fact to be considered in evaluating these rankings is that Murphy was working at Masseys' Valley Fair Store during all of 2001 and the beginning of 2002. The Valley Fair Store was Masseys' lowest ranked store in 2002.

In March, 2002, Murphy suffered a heart attack and spent some time in the hospital. After being discharged, Murphy met with Houman Alai, Vice President of Masseys, and Paul Sawaya, the general manager. Murphy was told that he could return to work twenty hours a week while he recovered. Murphy returned to work in April, approximately one month after the heart attack. Murphy was assigned to Masseys' South Towne Store after his heart attack. The South Towne location was Masseys' second lowest ranked store in 2002.

After having been back at work for a couple of weeks, Murphy began making requests to return to work full-time. Mr. Alai told Murphy he did not think that would be a good idea yet and that Murphy should spend more time recuperating. Murphy states in his affidavit that he obtained a release from his doctor allowing him to return to work full-time. No one at Masseys remembers seeing anything from the doctor, and Murphy has not produced anything corroborating his account.

After his requests to return full-time were denied, Masseys states that Murphy's attitude and performance on the job began to decline. Masseys cites as an example of this decline Murphy's failure to follow company policy and turnover, or "T.O.," customers to other salespersons. When a customer enters the store, the customer has an initial contact with a salesperson who attempts to complete a transaction. If the initial salesperson is unable to close the sale, he or she is to T.O. the customer to another salesperson with the hope that the sale can be completed. If a sale is completed, both salespersons receive a portion of the commission. Murphy's manager, Farid "Frank" Jahromi, states in his affidavit that after Murphy's return to work, he was reluctant to assist customers and failed to T.O. them to other salespersons.

As one example of this behavior, Masseys puts forth the affidavits of Frank Jahromi, Nathan Larsen (another sales-

---

1. Order Granting Defendant's Motion for Summary Judgment, Case No. 2:02CV1258

(D.Utah, Feb. 3, 2004).

person where Murphy was working), and Lars Arnell (a customer of Masseys). According to these affidavits, in May of 2002, Arnell entered Masseys' South Towne Mall location in Sandy, Utah. Arnell wanted to purchase one of Masseys' "past, present and future" rings. When Arnell told Murphy what he was looking for, Murphy stated that the store did not carry that style of ring. Murphy apparently made no attempt to check the inventory of other Masseys' stores for the ring or T.O. Mr. Arnell to another salesperson. Arnell then turned to walk out of the store when he was stopped by Murphy's manager, Jahromi, who had overheard the conversation. Jahromi told Mr. Arnell that the ring he wanted was not immediately available at the South Towne location but that he could arrange to have the ring custom-made or brought in from another Masseys' location. Jahromi then made an appointment with the customer. The customer returned one day later and purchased the $18,000 "past, present and future" ring, which had been transferred from another store. For his part, Murphy denies in his affidavit that he failed to T.O. the customer. As a result of this incident and Jahromi's perception that Murphy had a poor attitude and was reluctant to help customers, Jahromi approached Mr. Alai, Masseys' Vice President, and told him that Murphy's attitude was hurting the store and interfering with meeting quotas. Jahromi also approached Murphy about his attitude and performance. Jahromi states that after the meeting Murphy's performance only worsened. Jahromi then requested that Alai remove Murphy from Masseys' South Towne location. On May 17, 2002, Mr. Sawaya, another manager at Masseys', approached Murphy and asked, "How would you like to retire early?" Murphy asked if he

meant that he could receive a paycheck until he began receiving social security a short time thereafter. Sawaya responded, "No, no." To which Murphy responded, "Well then you're firing me, aren't you?" Sawaya then said he was firing Murphy and that it was not open for discussion.

On December 19, 2002, Murphy filed suit against Masseys. Murphy alleges three causes of action: (1) Violation of the Americans with Disabilities Act of 1990 ("ADA");[2] (2) Violation of the Age Discrimination in Employment Act ("ADEA");[3] and (3) Intentional infliction of emotional distress. The court will examine each of these causes of action in turn below, setting forth additional facts as required.

### Matthews' Employment Record

During 1999, Matthews worked at the Valley Fair store, Masseys' lowest ranked store. Matthews' sales performance during that year ranked him fifteenth out of seventeen salespersons who had worked the whole year. During 2000, Matthews' sales ranked him thirteenth out of sixteen salespersons. Matthews worked at the Valley Fair location until October of 2000 when that location was closed. In October, Matthews was transferred to the Crossroads Mall location. In 2001, Matthews ranked eleventh out of sixteen salespersons who worked the entire year. However, Masseys put forth an affidavit from Lori Garcia, Matthews' manager at the Crossroads Mall location, which states that Matthews' sale figures were inflated. Ms. Garcia states that she credited Matthews for sales that she initiated and closed, allowed Matthews to fill out sales tickets when she closed a sale, allowed Matthews to "size" jewelry for customers, and allowed Matthews to assist customers with credit applications for her sales. By

2. 42 U.S.C. § 12101, et seq.

3. 29 U.S.C. § 621 et seq.

performing these tasks, Matthews received credit towards his monthly quotas and commissions. Garcia says she assisted Matthews in this manner to help him reach his quotas. Masseys' records also show that Matthews closed 30% of his sales during 2001, which was the third lowest percentage among salespersons who worked the entire year. Matthews says this number is not accurate because salespersons were expected to T.O. to managers, thus inflating the closing percentage for the managers while lowering the percentage for salespersons. Additionally, Matthews had shoulder surgery, which caused him to miss significant time in November and December of 2001.

In January of 2002, Matthews was transferred to a second Valley Fair location. During this month, Matthews' sales placed him eighteenth out of nineteen salespersons. In February of 2002, Matthews was ranked thirteenth out of nineteen salespersons.

In March of 2002, Matthews was transferred to Masseys' Fashion Place location, which is also where Mr. Alai's office was located. In an affidavit, Mr. Alai states that he observed that Matthews' sales skills were deficient. Mr. Alai's observations led him to contact Ms. Garcia to inquire how Matthews had been able to reach his quotas while at the Crossroads location. Ms. Garcia informed Mr. Alai that she had assisted him, as described previously.

Matthews was again transferred to the Valley Fair location. Through May of 2002, Matthews' sales ranked him seventeenth out of eighteen salespersons who had worked since January. Matthews asserts that the poor ranking is partially due to being transferred so often during the early months of 2002. On June 15, 2002, Mr. Sawaya, at the request of Mr. Alai, terminated Matthews' employment with Masseys.

Matthews filed a Complaint against Masseys on December 17, 2002 claiming age discrimination and intentional infliction of emotional distress.

### Masseys' Work Force

Murphy and Matthews argue that they were replaced by younger workers. Michael Johnson was hired by Masseys five days before Matthews' termination (while Matthews was on vacation) to work at the same store where Matthews was working. Indeed, the day before his termination, Matthews was asked to "show [Johnson] the ropes." Johnson was thirty-nine years old on the date of his hiring. Sina Sharifan was hired by Masseys on May 15, 2002, two days before Murphy's termination. She was hired to work at the same store where Murphy had been working. Sharifan was twenty-one years old on the date of her hiring. Masseys insists that these individuals were not hired to replace Matthews and Murphy. Instead, Masseys argues Matthews and Murphy were fired as a result of an overall reduction in force due to declining economic conditions. To support this argument, Masseys cites employment records showing Masseys experienced an overall reduction in employees, from 37 to 35, between January of 2002 and January of 2003. In contrast, Matthews and Murphy cite employment records from Masseys showing that they experienced an increase in salespersons from 19 to 20 between December of 2001 and December of 2002. In addition, two of the nineteen employees in December of 2001 were part-time, and there were no part-time salespersons in December of 2002. Masseys responds that the December numbers are not an appropriate measure because additional salespersons are hired for the holiday season.

## DISCUSSION

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment "shall be rendered ... if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [4] The court must examine the evidence in the light most favorable to the nonmoving party.[5] However,

> The nonmoving party may not rest upon the mere allegations or denials of [his] pleading [but] must go beyond the pleadings and establish, through admissible evidence, that there is a genuine issue of material fact that must be resolved by the trier of fact. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.[6]

The Rule further requires that when a party moves for summary judgment and meets its burden, the nonmoving party "may not rest upon the mere allegations or denials" in their pleadings but must, "by affidavits or as otherwise provided in this rule ... set forth *specific facts* showing that there is a genuine issue for trial." [7] The goal of a motion for summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." [8]

## Murphy's ADA Claim

■ Murphy alleges that he was terminated by Masseys because of a "perceived disability" in violation of the Americans with Disabilities Act ("ADA"). Because Murphy will bear the burden of establishing the elements of violation of the ADA at trial, Masseys may "make its *prima facie* demonstration simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." [9] The burden then shifts to Murphy to set forth specific facts supporting his claim.

■ Murphy must demonstrate three things in order to show violation of the ADA: (1) that he has a disability, (2) that he is qualified for the position he was fired from, and (3) that Masseys discriminated because of his disability.[10] "Disability" under the ADA is a term of art and can refer to an individual who has an actual disability which "substantially limits one or more of the major life activities of such individual" or to an individual who is "regarded as having such an impairment." [11] Murphy does not allege that he had an actual disability but alleges that Masseys perceived him as having a disability and discriminated against him because of that perceived disability. Specifically, Murphy's Complaint states that "the Defendant terminated Plaintiff because the Defendant *perceived* Plaintiff to have a disability" and that "[d]efendant's actions in terminating

---

4. Fed.R.Civ.P. 56(c).

5. *McKenzie v. Mercy Hospital,* 854 F.2d 365, 367 (10th Cir.1988).

6. *Salehpoor v. Shahinpoor,* 358 F.3d 782, 786 (10th Cir.2004).

7. Fed.R.Civ.P. 56(e) (emphasis added).

8. *Id.* Advisory Committee Notes.

9. *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670–71 (10th Cir.1998) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

10. *Poindexter v. Atchison Topeka & Santa Fe Ry.,* 168 F.3d 1228, 1230 (10th Cir.1999).

11. 42 U.S.C. § 12102(2).

Plaintiff because of a *perceived* disability were in violation of Plaintiff's rights under the Americans With Disabilities Act."[12] The court will, therefore, proceed on the basis that a perceived disability is at issue.

In his affidavit, Murphy states that after being back at work for about two weeks, he felt capable of returning to work full-time. Murphy asked his manager, Jahromi, if he could begin working forty hours a week again. Jahromi told Murphy that he was not authorized to increase Murphy's hours. Murphy says he contacted his doctor who told him he could work forty hours a week but that Masseys continued to refuse his request. Murphy says Jahromi stated that Murphy was not capable of working more than twenty hours per week because of his physical condition. Murphy also states that Jahromi told him that Mr. Alai would not permit him to work in excess of twenty hours per week because of his physical condition. In response, Masseys proffers the affidavit of Jahromi, Murphy's manager, which states that the refusal to allow Murphy to return to work full-time was based on Murphy's poor job performance.

"[A] person is regarded as disabled within the meaning of the ADA if '. . . a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities.' "[13] The major life activity that Murphy apparently alleges Masseys believed was substantially impaired was working. The Tenth Circuit stated in *Sorensen v. University of Utah Hospital:*

> With respect to the major life activity of working—(i) The term *substantially limits* means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities. *The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.*[14]

In *Sorensen,* the plaintiff alleged that her employer perceived her multiple sclerosis ("MS") as precluding her from continuing her job as a flight nurse. The court rejected her claim, noting that "[p]laintiff alleges only that Defendant regards her MS as precluding her from holding the position of flight nurse. Because the position of flight nurse is a single job, this allegation does not support the claim that the Defendant regards Plaintiff as having a substantially limiting impairment."[15]

Masseys argues that *Sorensen* is applicable here. However, in *Sorensen,* the employer had offered the plaintiff several nursing jobs and had only refused to allow her to work as a flight nurse. The employer did not perceive her as being unable to work at all; the employer only perceived her as unable to perform a specific nursing job. In contrast, if Murphy's allegations are true, Masseys did see him as substantially impaired in his ability to work *any* job. Masseys refused to allow Murphy to work more than twenty hours a week at a job that did not require any physical exertion. Thus, it is reasonable to assume that if Masseys' refusal was based on a perceived disability, Masseys regarded Murphy as unable to work more than twenty hours a week at any job.

---

12. Complaint at 3 (emphasis added).

13. *Sorensen v. University of Utah Hospital,* 194 F.3d 1084, 1088 (10th Cir.1999) (quoting *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999)).

14. *Sorensen,* 194 F.3d at 1088 (emphasis in original) (quoting 29 C.F.R. § 1630.2(j)(3)).

15. *Sorensen,* 194 F.3d at 1089.

 However, Murphy has failed to offer specific facts tending to show that Masseys' refusal to allow him to work more than twenty hours a week was based on a perceived disability rather than poor job performance. Because Murphy bears the burden of establishing the elements of an ADA claim at trial, the court finds that Masseys has met its *prima facie* burden for summary judgment by "pointing out to the court a lack of evidence for the non-movant on an essential element of the non-movant's claim."[16] The only evidence Murphy has put forward tending to show that Masseys perceived him as having a disability is the statement of Jahromi that Murphy needed more time to recuperate before returning to work full-time. Jahromi also states that Murphy was not performing well at his job. Murphy was consistently at the bottom in salesperson performance. Additionally, according to Jahromi's affidavit, Murphy's performance and attitude were apparently worse after returning from his heart attack. When approached about this issue, Murphy's attitude apparently worsened more. Murphy attempts to refute this by alleging in his affidavit that he performed his job in a conscientious and professional manner. However, " 'conclusory and self-serving affidavits are not sufficient' " to create a genuine issue of material fact.[17] There is simply nothing in the record to support Murphy's allegation of discrimination based on perceived disability. In sum, the evidence that Murphy was refused additional hours and eventually terminated for poor job performance rather than a perceived disability is persuasive and has not been refuted by specific facts or evidence by Murphy. Because Murphy must establish all of the elements of an ADA claim, failure to establish a single element is a sufficient reason for summary judgment. "On summary judgment, issues concerning all other elements of the claim become immaterial if the plaintiff does not come forward with sufficient evidence on any essential element of the cause of action."[18]

### ADEA Claims

Under the Age Discrimination in Employment Act, it is "unlawful for an employer—(1) to ... discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age."[19] However, no unlawful action has occurred when the adverse employment action "is based on reasonable factors other than age."[20]

 Liability under the ADEA "depends on whether the protected trait [ (age) ] actually motivated the employer's decision."[21] Thus, the factor of age must have "determinative influence" on the decision to terminate the employee.[22] When ADEA claims are based on discrimination, as is usually the case, the Tenth Circuit has employed the burden of proof framework set forth in *McDonnell Douglas* to

16. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir.1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

17. *Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir.1995) (quoting *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir.1991)).

18. *Montgomery v. City of Ardmore*, 365 F.3d 926, 935 (10th Cir.2004).

19. 29 U.S.C. § 623(a)(1).

20. 29 U.S.C. § 623(f)(1).

21. *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 141, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

22. *Id.*

analyze motions for summary judgment.[23] The initial burden is on the plaintiff to establish a prima facie case of discrimination.[24] To meet this burden, an ADEA plaintiff must show: (1) that he was within ADEA's protected age group, (2) that he was qualified for the position, (3) that he was discharged, and (4) that his position was filled by a younger person.[25]

■■■ The court finds that both Murphy and Matthews have met this initial burden. Both were within the protected age group; both were qualified for their positions, as evidenced by the fact that they had been doing the job for over a decade; and both were terminated by Masseys. Additionally, although Murphy and Matthews cannot *prove* that younger workers were hired to replace them, the test requires only that they establish a *prima facie* case. By setting forth evidence that their terminations were arguably immediately preceded by the hiring of younger workers to work in the same stores at which they were working, the plaintiffs have met their initial burden.

■■■ Once a plaintiff has established a prima facie case, "[t]he burden shift[s] to respondent to produce evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason .... This burden is one of production, not persuasion; it can involve no credibility assessment." [26]

Masseys has met this burden. Masseys has set forth evidence that both Murphy and Matthews were consistently among the worst performing salespersons. In Murphy's case, his manager, a customer, and a co-worker all proffered affidavits concerning Murphy's poor attitude, poor performance, and failure to follow store policy. In Matthews' case, his manager set forth an affidavit stating that his low sales figures were artificially inflated by getting credit for sales he had nothing to do with. Further, the Vice President, Mr. Alai, personally observed Matthews' sales skills before making the decision to terminate him. The burden on Masseys was to "offer[ ] admissible evidence sufficient for the trier of fact to conclude that petitioner[s] [were] fired" for poor work performance.[27] Evidence of the poor sales performance of both Murphy and Matthews is sufficient to meet this burden.

The ultimate burden, therefore, rests on Murphy and Matthews.

> [I]n attempting to satisfy this burden, the plaintiff-once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision-must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.[28]

Plaintiffs can meet this burden "by showing that the employer's proffered explanation is unworthy of credence." [29]

■■■ Murphy and Matthews have failed to bring forth evidence to show that Masseys' proffered reasons for their terminations were pretextual. Neither plaintiff,

23. *Munoz v. St. Mary–Corwin Hospital*, 221 F.3d 1160, 1165 (10th Cir.2000) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

24. *Reeves*, 530 U.S. at 142, 120 S.Ct. 2097.

25. *Id.*

26. *Id.*

27. *Id.*

28. *Id.* at 143, 120 S.Ct. 2097.

29. *Id.*

for example, has brought forth any independent evidence that he was doing satisfactory work. An affidavit from a fellow employee, for example, might have shown that there was a genuine issue about the quality of their work. The only evidence Murphy and Matthews offer is their own conclusory statements concerning their performance and evidence that the stores they worked at consistently had lower sales. This evidence alone is not enough to establish a genuine issue of material fact.

The Tenth Circuit's case of *Salguero v. City of Clovis*[30] is instructive on this point. There, the Tenth Circuit rejected a claim by a police officer that he was terminated because of his race. The officer "proffer[ed] his own affidavit alleging disparate salary between himself and a comparable white employee, that unlike white officers, he received second-hand equipment, and that Hispanic officers were made to do 'translation work' without any extra compensation."[31] The court stated that "[s]uch conclusory allegations—lacking evidentiary support in the record—do not suffice to create a genuine question as to whether the City's work-related reasons for Salguero's termination were a pretext for discrimination."[32] Similarly, in *Murray v. Sapulpa,*[33] the Tenth Circuit rejected a claim of employment discrimination where the plaintiff set forth three affidavits that were "merely conclusory and [did] not provide any factual bases" for finding discrimination.[34] Because the plaintiff had "failed to present evidence showing he was terminated for discriminatory or retaliatory reasons [the case] cannot survive summary judgment."[35] Like the plaintiffs in *Salguero* and *Murray,* Murphy and Matthews have offered only conclusory allegations and have not set forth any specific facts showing that Masseys' stated reasons for terminating them were mere pretext for discrimination.[36]

> Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons.[37]

▮ Murphy states that evidence of pretext is present in the fact that Murphy's sales actually improved after his return, that Alai stated that he had not been concerned with Murphy's sales numbers upon Murphy's immediate return to work after his heart attack, that Masseys hired a younger employee at the same time Murphy was fired, and that he did not receive a customary warning letter before his termination. However, Masseys has demonstrated that a primary reason for the increase in sales was the partial credit given to Murphy for the $18,000 ring sale, which Masseys has demonstrated without specific dispute that Murphy almost lost due to his failure to T.O. the customer or check the inventory of other Masseys' stores. Additionally, sales production was not the only stated reason for firing Murphy. Poor

---

30. 366 F.3d 1168 (10th Cir.2004).

31. *Id.* at 1178.

32. *Id.*

33. 45 F.3d 1417 (10th Cir.1995)

34. *Id.* at 1422.

35. *Id.*

36. *See Murray v. Sapulpa,* 45 F.3d 1417, 1422 (10th Cir.1995) (affidavits which are "merely conclusory")

37. *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir.1997).

attitude and the failure to follow company policy were also stated as reasons. Moreover, the fact that someone younger was possibly hired to replace Murphy does not demonstrate age discrimination. Murphy's age made it likely that any replacement would be younger than him. But without evidence that he was fired because of his age in the first place, the fact that he was replaced by a younger worker alone does not provide evidence of discrimination. Finally, the failure to send a warning letter is not constitute evidence of discrimination. The warning letters concern the mechanics of the firing, not the cause.

Likewise, Matthews has failed to put forth evidence of age discrimination. Like Murphy, he has not set forth any evidence that age "actually motivated" Masseys' decision.[38] Masseys arguably hired a younger worker shortly before Matthews was fired. However, Matthews was sixty-two at the time, making it likely that any person hired by Masseys would be younger than him. Again, that is not evidence that he was fired because of his age. " '[I]t is not enough ... to *dis* believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination.' "[39] Although disbelief of the proffered reasons for termination accompanied with evidence supporting the prima facie case might be enough, in some instances, to justify a finding of intentional discrimination, in this case there is no reason to disbelieve that Murphy and Matthews were fired for poor job performance. Simply put, neither Murphy nor Matthews has put

forth any evidence that they were doing satisfactory work.

In sum, without evidence that Murphy and Matthews were doing satisfactory work, or other evidence that Masseys' stated reasons were pretextual, summary judgment in Masseys' favor is appropriate. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."[40]

### Intentional Infliction of Emotional Distress

■■■■ In order to show intentional infliction of emotional distress, the plaintiffs must demonstrate that (1) Masseys' conduct was outrageous, intolerable, and offensive to generally accepted standards of decency and morality; (2) Masseys intended to cause, or acted in reckless disregard of a likelihood of causing, emotional distress; (3) the plaintiffs suffered severe emotional distress; and (4) Masseys' conduct proximately caused the emotional distress.[41] Murphy alleges that firing a sixty-four year old just short of retirement and hiring a younger employee constitutes intentional infliction of emotional distress. In addition, the circumstances of Murphy's firing were insensitive. Murphy was asked, "How would you like to retire early?". He was then told that he was being fired and that it was not open to discussion. Murphy stated in his deposition that he experienced "disbelief" at being fired, that he found his firing "intolerable," and that he was "infuriated." Matthews also testified that he experienced disbelief at his termination and that he could not think

**38.** *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993).

**39.** *Reeves*, 530 U.S. at 147, 120 S.Ct. 2097 (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 519, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

**40.** *Salehpoor v. Shahinpoor*, 358 F.3d 782, 786 (10th Cir.2004).

**41.** *Prince v. Bear River Mut. Ins. Co.*, 56 P.3d 524, 535 (Utah 2002).

straight for a year. Murphy and Matthews also claim that Masseys' conduct was outrageous because Mr. Alai makes false promises to employees to motivate them and that although Mr. Alai made the decision to fire plaintiffs, he used Mr. Sawaya as his "hatchet man." While one could debate the fairness or propriety of these actions, the court finds as a matter of law Masseys did not rise to the level of "outrageous" conduct.

 Only "outrageous conduct" which offends "generally accepted standards of decency and morality" can constitute intentional infliction of emotional distress.[42] "Outrageous conduct ... is conduct that evokes outrage or revulsion; it must be more than unreasonable, unkind or unfair. Additionally, conduct is not outrageous simply because it is tortious, injurious, or malicious, or because it would give rise to punitive damages, or because it is illegal."[43] Murphy's termination may have been unkind, but it was not outrageous. Matthews does not set forth any of the circumstances of his firing. Additionally, neither party contends that *they* were lied to by Mr. Alai, and the fact that Mr. Alai had Mr. Sawaya inform them that they were fired is far from the outrageous conduct required to establish intentional infliction of emotional distress. Finally, Masseys has demonstrated that it had good reasons for terminating their employment. As such, the court cannot find that Masseys' conduct constitutes intentional infliction of emotional distress.

### CONCLUSION

Defendant's motion for summary judgment against plaintiff Richard L. Murphy is GRANTED (Case No. 2:02–CV–01396 # 20–1). Defendant's motion to strike the affidavit of Richard L. Murphy is DE-

NIED (# 32–10). The Clerk's Office is directed to close this case.

In the separate case brought by Ronald L. Matthews, Defendant's motion for summary judgment is GRANTED (Case No. 2:02–CV–01392 # 18–1). Defendant's motion to strike the affidavit of Ronald L. Matthews is DENIED (# 28–1). The Clerk's Office is directed to close this case.